UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

TONI LEE CHIARADIO,

         Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

         Defendant.

Civil Action No. 09-2455 (PGS)

O P I N I O N

This matter is before the Court on the appeal of Plaintiff, Toni Lee Chiaradio from the Commissioner of Social Security's ("Commissioner") denial of her application for disability insurance benefits. Plaintiff filed an application for disability insurance benefits on November 10, 2005 alleging disability beginning September 10, 2005 due to chronic asthma, lower lumbar pain[1], cystitis, bipolar disorder and diverticulitis. (R. 93).

I.

Plaintiff is a high school graduate with no vocational training. Plaintiff worked as a data entry clerk for a copier company and as a secretary/receptionist in 2000-02 for Newbridge Services where she greeted patients, answered the telephone, handled patient files and copied documents. At Newbridge Services, she wrote, typed and moved small objects. This entailed sitting for five hours, standing for an hour and walking for an hour. In 2002, Ms. Chiaradio changed careers. She became a self-employed office and home cleaner. She worked in this field until September 10, 2005.

---

[1] Although lumbar pain is an alleged cause of disability, little evidence is presented.

Plaintiff is a 48 year old woman who weighs approximately 135 pounds. Plaintiff suffers from chronic asthma and uses Singular, Advair, a nebulizer and a Albuteral inhaler to control her symptoms. She is a moderate smoker (5-10 cigarettes per day for many years). She speaks with a raspy voice due to the nebulizer and other inhalers she has used every day since the 1980s. In addition, Plaintiff allegedly suffers from chronic cystitis and diverticulitis. Her medications include Carisoprodol and Skelaxin every four to six hours. Lastly, Plaintiff suffers from bipolar disorder which she describes as chronic depression and anxiety with panic attacks. She takes Lexapro, Trazadone and Xanax daily. Due to her depression, she is tearful twice a week because she does not feel good, wishes to work and to be more active.

Approximately two months after filing for disability insurance benefits, Plaintiff completed an Adult Function Report. Paraphrasing, Plaintiff summarizes her daily activities as follows. In the mornings, she awakes and immediately uses her nebulizer and takes medication to breathe better. Then she awakes her daughter (14 years of age) and helps prepare her for school. She drives her daughter to school. Upon returning home, Plaintiff takes medicine to relieve back pain, performs some chores, and re-uses her nebulizer. In the afternoon, she will pick up her daughter from school, make dinner and do other housework. After dinner she nebulizes again and applies a heating pad to her back. Finally, she takes all her evening medications, showers and goes to bed. Plaintiff acknowledges that she takes care of all her personal care (at a slower pace); but doesn't do any yard work because of her asthma. She seldom leaves the house except to see a doctor or her sister. Since she drives a car, she attends to her own banking and shops for food and clothes. Plaintiff reads books and the bible. Socially, Plaintiff talks to friends on the phone and regularly visits with her sons who come for dinner. She regularly attends church, group therapy and a psychiatrist. (R. 144).

Plaintiff states that as a result of her condition she can not lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs or complete tasks. She can not walk without stopping and using her nebulizer. She uses a cane for her back and wears a mask outside to prevent allergic reactions and asthma. (R. 135).

At the hearing, Plaintiff testified that she takes oral steroids every few months for her asthma. The oral steroids make her irritable and exacerbate her bipolar disorder. (R. 43). She limits her walking to a block, and avoids being outside when the weather is humid, rainy or cold. (R. 47). According to Plaintiff, she cannot work as a receptionist since her breathing is affected when it rains, or by inhaling perfume or dust. In addition, exposure to sick people can compromise her breathing.

*Medical Reports with Regard to Cystitis*

The reports of Essex Hudson Urology document Plaintiff's history of cystitis and treatment between 2004 to 2006. On October 7, 2004 Plaintiff was treated for chronic cystitis and pain management. At the time, Plaintiff complained of pressure along her bladder and lower back, as well as urinary problems with frequency, straining to urinate, slow urinary stream and difficulty starting urination. On examination she appeared to be in no distress. Her appearance, blood pressure, and heart rate were normal. Her lungs were clear bilaterally and she had a regular heart rate and rhythm. On October 14, 2004 she was seen for a follow up exam as she was still having symptoms. A cystoscopy was performed and was negative. On October 26, 2004 she was seen again complaining of same symptoms and lower abdominal discomfort. The doctors prescribed Percocet for pain. November 30, 2004 progress notes indicate she was doing better on Elmiron, Ditropan and Atrax.

On January 27, 2005, doctors described her abdominal discomfort as occasional. She reported gross hematuria, although according to the record, her urinalysis had always been negative.

On October 18, 2005, David S. Wu, M.D. examined Plaintiff as a follow up for interstitial cystitis. At the time of Wu's examination, she was relatively stable with medications and her urine cytology was negative. She was treated with Elmiron.

*Medical Reports with Regard to Asthma Treatment*

On November 4, 2004, Plaintiff was admitted to Chilton Memorial Hospital. At the time, Plaintiff complained of asthma and difficulty breathing for the past two days. Her speech was coherent. (R. 229). She was given Proventil and IV steroids which yielded mild improvement. The results of a radiology study revealed that Plaintiff's lungs were clear and her heart was normal. Medhat Ismail, M.D. diagnosed acute severe asthma most likely secondary to smoking.

On September 26, 2005, Plaintiff was again treated at Clilton Memorial Hospital Emergency Room for an asthma attack. Her airway was compromised, her breathing was labored and she was apprehensive. She had mild difficulties with breathing, wheezing, and a non-productive cough. She reported pain in her head and in between her shoulder blades. Her lungs were clear. She reported smoking 1/4 pack of cigarettes per day. She was discharged with instructions to see her doctor. She was given a prescription for an Albuteral inhaler, Prednisone and Davorcet. (R. 226). The radiology report revealed hyperinflation of the lung fields and flattening of the hemidiagrams consistent with obstructive lung disease. Her heart size was within normal limits.

On February 2, 2006, Plaintiff was again admitted to Chilton Memorial for acute exacerbation of asthma. On admission, she was experiencing mild wheezing. She was placed on IV steroids and a bronchodialotor with good clinical response. She was discharged with a tapering dose of Prednisone. The final diagnosis was acute exacerbation of asthma, toxic effects of tobacco, bipolar disease and anemia.

*Reports with regard to Bipolar Disorder*

The record documents Plaintiff treated at Newbridge Services, Inc. between September 11, 2001 and July 26, 2006 for counseling and medication for her anxiety, bipolar disorder and insomnia.

At the September 27, 2001 initial psychiatric evaluation, Plaintiff reported symptoms of bipolar disorder which were exacerbated by emotional highs and lows. At that time she reported that she had one previous hospitalization for attempted suicide. Plaintiff reported alcohol abuse at the age 13. Additionally, she smoked marijuana beginning at age 12, and used cocaine at age 18. She reported that she became sober at age 30 and had been abstinent since 1999. She attends Alcoholic Anonymous meetings weekly.

A summary of her psychiatric treatment at Newbridge Services, Inc. is as follows.

The progress notes from March, April and May, 2002 indicate Plaintiff was feeling anxious and was prescribed Prozac for her symptoms. After taking Prozac, she felt much better. Plaintiff found the treatment and medication satisfactory. At that time she denied suicidal ideation. However, in August, 2002, the progress notes indicate that Plaintiff felt suicidal, depressed, tired and alone. (R. 345). On August 10, 2002, Plaintiff was admitted to Newbridge's Residential Program due to same. At the time of discharge, Plaintiff was calm and cooperative with no thoughts of suicide expressed. Judgment and insight showed improvement. (R. 374, 457-458). In a December 26, 2002 psychiatric update, Dr. Agura found Plaintiff was well groomed, cooperative and goal oriented. Her mood was depressed; but her affect was appropriate, and she displayed good insight and judgment.

In January 2003, progress notes indicate that Plaintiff was isolating herself, and felt moody, but she denied suicidal ideation. (R. 342). In March 2003, she reported being depressed and agreed

to take Lexapro but was concerned about its cost. In August 2003, the Lexapro was working. She related that she had no complaints about her medications and stated that "I feel like I've leveled out with no highs or lows." In September 2003, there was some set back because she felt depressed and had some suicidal ideation. She looked pale, scared and in the severe depression range. (R. 337). In October 2003, she was mildly depressed with no evidence of mania. Her thought processes were coherent. (R. 336). In December, 2003 she was experiencing depression but had no signs of mania. (R. 335).

On December 10, 2003, Sarah Sattin, RN, APNC of NewBridge Services updated Plaintiff's psychiatric evaluation. At the time, Plaintiff was suffering from depression, fatigue, anxiety and had difficulty sleeping. Ms. Sattin found Plaintiff was bipolar and assessed her Global Assessment of Functioning (GAF) as 65.[2] (R. 356).

At a November 17, 2004 psychiatric update, Ms. Sattin again diagnosed bipolar disorder and her GAF was assessed at 65. (R. 355).

A November 7, 2005 psychiatric update by Ms. Sarah Sattin found Plaintiff to be moderately depressed; and her diagnosis was bipolar depression and her GAF was rated as 70. She was treating with Lexapro, Xanax and Seroquel. (R. 351).

---

[2] A GAF of 65 indicates some mild symptoms (e.g. depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

*Consultative Mental Examination*

Plaintiff was examined by consultative examiner, Alec Roy, M.D., on April 4, 2006. (R. 264-68). When Dr. Roy asked Plaintiff why she stopped working, Plaintiff answered "my asthma, my back." (R. 267). She reported to Dr. Roy that she was seeing a psychiatrist at Newbridge Psychiatric Outpatient program once every two weeks since 2000. She had manic highs that last about two days followed by a period where she "crashes" and becomes depressed and cries for no reason. She was not sleeping very well; and her appetite and mood were "not too good." She reported being in recovery for alcohol and drug use and has been in recovery for six years, and undertook treatment at the Carrier Clinic in 1999. Presently, she regularly attends Alcoholics Anonymous meetings. Dr. Roy found her speech was normal and there was no evidence of hallucinations, paranoia, delusions or memory dysfunction. She was fully oriented, and she had a reasonable fund of general information. Her judgment was good. Dr. Roy stated that Plaintiff's low grade effective symptoms seem to have been chronic in recent years and her GAF was assessed at 60 (moderate symptoms). (R. 267).

The Psychiatric Review Technique was conducted on April 26, 2006 and found a severe medically determinable impairment of bipolar disorder, but also found that it was not expected to last 12 months, and did not precisely satisfy the diagnostic criteria. (R. 283, 286). In addition, functional limitations on daily living activities were found to be moderate with mild difficulties in maintaining social functioning; concentration, persistence and pace. There were no "marked" or "extreme" limitations found.

The Mental Residual Functional Capacity Assessment of the same date found Plaintiff to be moderately limited in her ability to carry out instructions, and to maintain attention and concentration

for extended periods.  Her ability to work in coordination with others without distraction was limited.  This Functional Capacity Assessment found that Plaintiff's fundamental limitations are primarily related to her physical allegations with "her psychiatric symptomology secondary but not functionally limiting by themselves." (R. 297).

The Residual Functional Capacity Assessment dated May 11, 2006 found that Plaintiff was limited to occasionally lifting and/or carrying 50 pounds, but could frequently lift and/or carry 25 pounds. In addition, she could stand and/or walk (with normal breaks for about 6 hours in an 8 hour workday); and sit for a long period with  normal breaks.  There were no postural, manipulative, visual or communicative limitations. Environmental limitations included avoiding concentrated exposure to extreme cold or heat, wetness, humidity and fumes, odors, dusts, gasses, and situations with poor ventilation. (R. 301-308).

## II.

The ALJ followed the five step sequential test for determining disability.  Without reviewing each step, the Court focuses on the findings of Step 2 that are hotly contested, especially with regard to the ALJ's finding that Plaintiff did not suffer from any bipolar disorder of a substantial nature.

At Step 2, the ALJ must determine whether the claimant has a medially determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c) and 416.920(c)).  An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.  An impairment or combination of impairments is "not severe" when medical and other evidence establish a slight abnormality or a combination of slight abnormalities that would have  not more than a minimal effect on an individual's ability to work (20 CFR 404.1521 and 416.921; Social

Security Ruling (SSR) 85-28, 93-3 and 96-4). To the contrary, if the claimant has a severe impairment or combination of impairments the analysis proceeds to the third step.

At Step 2, the ALJ found severe impairments of asthma and lumbar muscle spasms because they "impose more than a slight limitation on claimant's ability" to work. With regard to the bipolar impairment, the ALJ found differently. He states, "the evidence fails to establish that the claimant's bipolar impairment has had any greater than a slight or minimal affect" on her ability to work.

The ALJ reviewed the record to support his determination of no bipolar impairment effects on her ability to work. The ALJ wrote:

> The evidence fails to establish that the claimant's bipolar impairment has had any greater than a slight or minimal effect on ability to perform basis work activities, and thus, it is not severe. Her treating source, New Bridge Services, characterized her as stable, which is not inconsistent with the essentially benign findings of consultant examiner Roy, who noted in April, 2006 that while the claimant's mood was reported to be "low spirited", the rest of the examination was unremarkable. She was pleasant and fully oriented; her speech and thought disorder were intact; and her memory, concentration, judgment and insight were intact Additionally, GAF ratings made by treating and consultative sources were in the sixties, which is quite functional. Thus, no weight is accorded to the assessment of moderate mental limitations in multiple areas of mental functioning made by the state agency.
> 
> Regarding the claimant's mental status, the applicable test for determining whether a mental impairment significantly limits an individual's ability to perform basic work activities hinges on an assessment of its impact on factors such as the ability to understand, carry out, and remember instructions, as well as the ability to respond appropriately to supervisors, co-workers and work stresses in a work setting (20 CFR 404.1545(c) and 20 CFR 416.945(c)). In this regard, psychiatric signs necessary to define the parameters of a particular impairment are interpreted as "medically demonstratable phenomena which indicate specific psychological abnormalities of behavior, affect, mood, thought, memory, orientation and contact with reality." (20 CFR 404.158(b) and 20 CFR 416.928(b). In the instant case, the

> evidence regarding the claimant's mental impairment establishes that the claimant has suffered from an affective disorder within the meaning of medical listing 12.04 of Appendix 1, Subpart P, regulations No. 4. With respect to the applicable B criteria of such listing, the evidence establishes that the claimant experiences functional limitations including: mild restrictions of activities of daily living; no difficulties in maintaining social functioning; mild deficiencies of concentration, persistence or pace; and no episodes of decompensation. The requirements of the C criteria have not been met. In addition to the above, the claimant has the ability to understand, carry out, and remember basic work instructions; to use judgment in making work related decision; to respond appropriately to supervisors, co-workers and work situations; and to deal with changes in a routine work setting. Because the claimant's medically determinable mental impairment has had no greater than a slight or minimal effect on the ability to perform basic work activity, it is not severe. (20 CFR 404.1520(a)(d)(1) and 416.920(a)(d)(1).

Review of the ALJ's final decision is limited to determining whether the findings and decision are supported by substantial evidence in the record. *See Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *see also* 42 U.S.C. § 405(g). The Court is bound by the ALJ's findings of fact if they are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g)*; Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.*" Hartranft,* 181 F.3d at 360 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation omitted)); *see Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla. *Richardson*, 402 U.S. at 401; *Morales*, 225 F.3d at 316; *Plummer*, 186 F.3d at 422. Likewise, the ALJ's decision is not supported by substantial evidence where there is "competent evidence" to support the alternative and the ALJ does not "explicitly explain all the evidence" or "adequately explain his

reasons for rejecting or discrediting competent evidence." *Sykes*, 228 F.3d at 266 n.9.

The reviewing court must view the evidence in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984). As the Third Circuit stated:

> A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence - - particularly certain types of evidence (e.g., that offered by treating physicians) - - or if it really constitutes not evidence but mere conclusion.

*Morales*, 225 F.3d at 316 (citing *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983)); *Benton v. Bowen*, 820 F.2d 85, 88 (3d Cir. 1987). Nevertheless, the district court's review is deferential to the ALJ's factual determinations. *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (en banc) (stating that the district court is not "empowered to weigh the evidence or substitute its conclusions for those of the factfinder."). A reviewing court will not set a Commissioner's decision aside even if it "would have decided the factual inquiry differently." *Hartranft*, 181 F.3d at 360. But despite the deference due the Commissioner, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence." *Morales*, 225 F.3d at 316 (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)).

Title II of the Social Security Act (42 U.S.C. § 401, *et seq*. requires that the claimant provide objective medical evidence to substantiate and prove his or her claim of disability. *See* 20 CFR § 404.1529. Therefore, a claimant must prove that his or her impairment is medically determinable and cannot be deemed disabled merely by subjective complaints such as pain. A claimant's symptoms "such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect . . . .[one's] ability to do basic work activities unless "medical signs" or laboratory findings

11

show that a medically determinable impairment(s) is present." 20 C.F.R. §404.1529(b); *see Hartranft*, 181 F.3d at 362.

The Plaintiff alleges the onset of disability on September 10, 2005. Her psychiatric exams before and after that date support the ALJ's decision. They are:

\*   December 10, 2003 psychiatric update by Sarah Sattin, RN, found Plaintiff with some depression, but with a tolerable GAF of 65.

\*   November 17, 2004 psychiatric update by Sattin found Plaintiff with depression and her GAF continued to be 65.

\*   November 7, 2005 psychiatric update by Sattin found only moderate depression and Plaintiff's GAF was a very acceptable 70.

\*   April 4, 2006 examination by Dr. Roy found although Plaintiff had some depression, her thought processes were normal, there was no paranoia, and her GAF was a 60.

\*   The April 26, 2006 Psychiatric Review Technique found severe bipolar disorder but found it should not last 12 months.

\*   The September 18, 2006 Mental Residual Functional Capacity Assessment found "Plaintiff's fundamental limitations are primarily limited to her physical allegations with her psychiatric symptomology secondary but not functionally limiting by themselves."

Plaintiff argues that the Mental Residual Functional Capacity Assessment ("Assessment") dated September 18, 2006 has findings which show moderately limited psychiatric functions. These are sufficient to be assessed at Step 2 as well as all the other steps. The Assessment states that Plaintiff has moderately limited functions. They are the ability to: carry out detailed instructions; maintain concentration; work in coordination with others; complete a workday and workweek; interact appropriately with customers; accept instructions from supervisors; and get along with co-workers. However, these preliminary findings fail to factor in the conclusion of the Assessment.

Plaintiff's argument incorrectly separates the symptoms from the Assessment's conclusions. The examiner's conclusion is most germane. The conclusion is that the Plaintiff's "psychiatric symptomology [is] secondary but not functionally limiting by themselves." Here, the ALJ accepted the examiner's conclusion in making his finding in light of the mild symptomology. As noted above, the ALJ's conclusion was based upon substantial evidence.

Parenthetically, the Court was concerned that the ALJ failed to discuss the impact of Plaintiff's alcohol and cocaine abuse; however, it was not a factor in the outcome according to Plaintiff's attorney. As such, the ALJ made no error in failing to consider them in his decision.

III.

At Step 4 of the sequential evaluation, Plaintiff alleges that the ALJ erred. The error is that the ALJ did not provide sufficient detail in assessing Plaintiff's ability to return to the receptionist position. As Plaintiff argued:

> Residual functional capacity must be described in terms of specific work limitations and/or capabilities on a "function by function basis" (20 CFR 404.15 and 416.945, SSR 96-8P). An ALJ must absolutely compare that residual functional capacity with the proper description of the physical and mental demands of past relevant work (20 CFR 1560b and 416.960b and SSR 82-62 and SSR 96-8P). In the instant case the ALJ does not and did not make a "task by task" comparison between plaintiff's part-time work as a medical office receptionist and her residual functional capacity.

At Step 4 of the evaluation, the ALJ must determine whether the claimant has the residual functional capacity to perform the requirements of her past relevant work (20 CFR 404.1520(f) and 416.920(f)). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years prior to the date of

13

disability. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been significant gainful activity. If the claimant has the residual functional capacity to do her past relevant work, the claimant is not disabled.

The Plaintiff is upset that the ALJ did not carefully consider each symptom and compare it to the proposed work situation. The ALJ summarized his Step 4 finding as follows:

> 6. The claimant is capable of performing past relevant work as a receptionist for New Bridge Services. She testified that it was a sitting job with no significant lifting or carrying in a mental health office (testimony). This work does not require the performance of work-related activities that preclude by the claimant's residual functional capacity. Although this was a part time job, she earned in excess of $1,000 per month, which qualifies it as substantial gainful activity and past relevant work for the year 2000. In comparing the claimant's residual functional capacity with the physical and mental demands of this work, I find that the claimant is able to perform it as she actually performed it.

At step four of the sequential evaluation process, the ALJ determined that Plaintiff could perform her past relevant work as a receptionist because that work did not require capabilities which exceeded her residual functional capacity. (R. 20-21). The ALJ's decision is supported by the evidence. Plaintiff reported that her past work as a receptionist included typing, helping clients, filing, using a copier, and answering telephones. (R. 114, see also R. 159). She sat for five hours, stood for one hour, and walked for one hour. The job required kneeling for one-half hour but no crouching, crawling, handling or grasping big objects was necessary. It did require writing, typing or handling small objects for five hours per day. Plaintiff would have to move patient files once a week, and she never lifted any weight of ten pounds or more.

The ALJ concluded that based on the medical and other evidence, Plaintiff had the residual functional capacity to perform light work with the ability to stand, walk, or sit for up to six hours in an eight-hour day, lifting and carrying 20 pounds occasionally and 10 pounds frequently, but required an environment free of pulmonary irritants. (R 16-20). Thus, given the evidence in the record regarding Plaintiff's past work, the ALJ correctly determined that Plaintiff's past work as a receptionist was not precluded by her residual functional capacity and that she could return to performing her past work. (R. 20-21).

Although the ALJ did not make a task by task analysis as Plaintiff suggests, the ALJ's overall depth of review carefully considered Plaintiff's work at Newbridge Services, and the ALJ assessed what Plaintiff could reasonably do. In an added twist, Plaintiff terminated her employment at Newbridge Services and became self employed as a home and office cleaner. It's an odd choice because Plaintiff suffers with asthma. Generally, asthma sufferers shy away from allergy prone jobs. The pet dander, dust, dust mites and foul odors of cleaning aggravate allergic reactions. Hence, Plaintiff's other work of house and office cleaning was an adverse situation. Under the circumstances, the ALJ's decision is reasonable.

Finally, the ALJ has discretion to evaluate the credibility of Plaintiff's complaints and draw a conclusion based upon medical findings and other available information. *Jenkins v. Commissioner*, 2006 U.S. App. Lexis 21295 (3d Cir. 2006). Generally, the credibility of witnesses is quintessentially the province of the ALJ. "Credibility determinations are the unique province of a fact finder." *See generally Dardovitch v. Haltzman,* 190 F.3d 125 (3d Cir. 1999) (internal quotation omitted). Inasmuch as the Administrative Law Judge has the opportunity to observe demeanor and determine credibility, his observations on these matters must be given great weight. *See Wier v.*

15

*Heckler*, 734 F. 2d 955, 962 (3d Cir. 1984).   Here, the ALJ found Plaintiff was not credible about her inability to perform work related functions. He found:

> The claimant's complaints of disabling pain and other symptoms and limitations precluding all significant work activity, especially regarding her assertions about limitations on sitting, standing, walking, lifting and carrying, are not credible or consistent with Social Security Ruling 96-7, 20 CFR 404.1529 and 20 CFR 416.969.

Under all the circumstances and findings, the ALJ's decision is based on substantial evidence and is affirmed.


*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

June 30, 2010